UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN
CIVIL ACTION NO. 1:05CV-00206-TBR

CLESSIE MEADOR and
SONDRA MEADOR                                                            PLAINTIFFS


VS.


INDIANA INSURANCE COMPANY                                               DEFENDANT



<u>MEMORANDUM OPINION</u>

Before the Court is Defendant's renewed motion for summary judgment (DN 70).

Plaintiffs have filed a response (DN 85) with supporting exhibits filed under seal (DN 86) and

Defendant has filed a reply (DN 87).  This matter is ripe for determination.  For the reasons set forth

below, the Court concludes Defendant's renewed motion for summary judgment is granted.



<u>STANDARD OF REVIEW</u>

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  The inquiry under Rule 56(c) is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law."  <u>Anderson v. Liberty Lobby, Inc.,</u>

477 U.S. 242, 251-252 (1986); <u>see also</u> <u>Street v. J.C. Bradford & Co.,</u> 886 F.2d 1472, 1479 (6th Cir.

1989).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a

party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial..."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and demonstrating the absence of any genuine issue of material fact. Celotex, 477 U.S. at 322-323.  Once the moving party satisfies this burden, the burden shifts to the non-moving party to demonstrate there is a genuine issue of fact for trial.  Anderson, 477 U.S. at 247-248.  Although the Court must review the evidence in a light most favorable to the non-moving party, the non-moving party is required to do more than simply show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rule 56 requires the non-moving party to present "*specific facts* showing there is a *genuine* issue for trial," by affidavit, depositions, answers to interrogatories, and/or admissions on file.  Fed.R.Civ.P. 56(c) and (e) (emphasis added); Celotex, 477 U.S. at 324.  The substantive law governing the case will determine what issues of fact are material.  Street, 886 F.2d at 1479-1480.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, the motion for summary judgment should be granted."  Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1069-1070 (6th Cir. 1991) (citing Matsushita Elec. Ind. Co., 475 U.S. at 586).

## BACKGROUND

On December 15, 2003, Plaintiff Clessie Meador was shopping in a Sav-A-Lot grocery store in Scottsville, Kentucky.  As he removed a case of soda from a display, one or more cases of soft drinks struck and injured him.  An ambulance transported Mr. Meador to a nearby

hospital.

At the time the accident occurred Houchens Industries, Inc. ("Houchens") was doing business as Sav-A-Lot.  Houchens was insured with Indiana Insurance Company ("Indiana Insurance").  On or about December 17, 2003, Mr. Meador's claim was assigned to Karen J. Lasch ("Lasch"), a senior claims representative with Indiana Insurance (DN 70, Exhibit A; DN 85, Exhibit A at Page 000001).

During a telephone conversation on December 18, 2003, the store manager, Jerry Carver ("Carver"), indicated to Ms. Lasch that Mr. Meador could not grip the case of soda when he pulled it off the display because he has only one finger on one of his hands (DN 86, Exhibit A at Page 000001).  Mr. Carver believed this inability to grip caused a couple of cases to be pulled off the display and strike Mr. Meador (DN 86, Exhibit A at Page 000001).  Mr. Carver informed Ms. Lasch that the display is stocked by the RC Cola driver every day or so and that store personnel stack reinforcements (DN 86, Exhibit A at Page 000001).

On January 12, 2004, Ms. Lasch conducted telephonic interviews of Mr. Meador and the only eyewitness, Johnny Pedigo (DN 86, Exhibit A - - Claims Diary at Pages 000001-000003).  During these interviews, Ms. Lasch heard two very different versions of how the accident occurred (DN 86, Exhibit A - - Claims Diary at Pages 000001-000003; DN 70, Exhibit A - - Statement of Mr. Meador).  In his recorded statement, Mr. Meador indicated he bent over, picked up a 24-pack of soft drinks from a display on a wooden palate and, as he turned to place the case of soda in his shopping cart, cases stacked up quite high on a different part of the display fell for no apparent reason and struck him (DN 86, Exhibit A - - Claims Diary at Pages 000001-000003; DN 70, Exhibit A - - Statement of Mr. Meador).  By contrast, Mr. Pedigo reported seeing Mr. Meador step onto the display, reach up, and as he pulled a case of soda from the display he fell backwards causing cases

3

to fall from the display on top of him (DN 86, Exhibit A - - Claims Diary at Pages 000001).

Notably, while taking the recorded statement from Mr. Meador, Ms. Lasch commented "[y]our name's very familiar I want to say I had a work comp claim with you years ago, many moons ago, like 25 years ago..." (DN 70, Exhibit A - - Statement of Mr. Meador at Page 1). Mr. Meador did not respond to her comment but, at a later point in his recorded statement, he did identify a number of previous work-related injuries (DN 70, Exhibit A - - Statement of Mr. Meador; DN 86, Exhibit A - - Claims Diary at Page 000002).  He also indicated as a result of these past work-related injuries all that remains on his right hand is half of an index finger and a thumb, he has undergone back and neck surgery, he is a chronic pain patient, and he is considered totally disabled (DN 70, Exhibit A - - Statement of Mr. Meador; DN 86, Exhibit A - - Claims Diary at Page 000002).

On February 23, 2004, Ms. Lasch received a letter advising that attorney Hal D. Friedman represented Mr. Meador in his injury claim arising out of the December 15, 2003 accident (DN 70, Exhibit A).  In that letter, Mr. Friedman asked for information regarding insurance coverage (DN 70, Exhibit A).

In a letter dated February 29, 2004, Ms. Lasch informed Mr. Friedman that the insurance policy did provide medical payments coverage of $5,000, regardless of liability (DN 70, Exhibit A).  Additionally, she informed Mr. Friedman "[i]n Mr. Meador's case, we will require medical records for the 5 years preceding the incident, to confirm treatment relates to our accident vs. his past medical condition" (DN 70, Exhibit A).  Notably, the final sentence in her letter reads, "[w]e do not believe our insured was the negligent party, and request your thoughts with regards to this issue" (DN 70, Exhibit A).

In a letter dated March 4, 2004, Mr. Friedman directed Ms. Lasch not to make payment to any medical providers until she received written authority from him (DN 70, Exhibit A).

4

He requested confirmation that Houchens operates the Sav-A-Lot store in Scottsville (DN 70, Exhibit A). Additionally, he advised Ms. Lasch that he was relying on the doctrine of *res ipsa loquitor* to establish negligence (DN 70, Exhibit A). However, Mr. Friedman did ask Ms. Lasch to provide him with any facts she believed might demonstrate someone other than the store was responsible for all or a portion of the claim (DN 70, Exhibit A).

Notably, in a subsequent Claims Diary entry, Ms. Lasch acknowledged Mr. Friedman's letter advising that he did not want her to make payment to any medical providers until she received written authority from him (DN 86, Exhibit A at Page 000003). She questioned whether Mr. Friedman had the right to make such a request but indicated she will advise providers if they call (DN 86, Exhibit A at Page 000003). Ms. Lasch also observed that Mr. Friedman was alleging someone other than his client breached the duty of care and believed the doctrine of *res ipsa loquitor* will apply (DN 86, Exhibit A at Page 000003). Notably, she indicated "I CERTAINLY DISAGREE" (DN 86, Exhibit A at Page 000003) (all capital letters in the original text).

A March 9, 2004, entry in the Claims Diary sets forth Ms. Lasch's liability and damages analysis for the purposes of setting a reserve on Mr. Meador's claim against the insured (DN 86, Exhibit A at Pages 000003-000004). In relevant part her analysis reads as follows:

> "LIABILITY: THE ROYAL CROWN ROUTEMAN [sic] WAS IN THE STORE, BACK IN THE STOREROOM AT THE TIME. WAS THERE TO RESTOCK THE DISPLAY. INSURED SAYS THE ROUTEMAN [sic] STOCKS DISPLAY, AND IF NEED BE INSURED EMPLOYEES WILL RESTOCK AS NEEDED. THIS OCCURRED EARLY ON MONDAY. ATE [sic]PERSON HAD BEEN IN OVER THE WEEKEND.
> IF THE DISPLAY WAS UNSAFE, ROUTEMAN [sic] SHOULD HAVE STABILIZED IT PRIOR TO RESTOCKING. COMPARATIVE NEGLIGENCE - AM NOT SURE CLMT IS FREE FROM FAULT HERE. MY ASSESSMENT FOR THE PURPOSE OF RESERVE IS 40/40/20.
>
> INJURY: CLAIMANT IS ALREADY DISABLED, HAS ONLY 1.5 FINGERS ON ONE HAND, PRIOR BACK/NECK PROBS. HE IS CLAIMING EXACERBATION OF NECK & BACK PAIN, ROTATOR CUFF INJURY

5

W/SURGERY.

DAMAGES: UNKNOWN AT PRESENT.  ATTORNEY HAS NOT SENT MUCH INFORMATION.  WE HAVE RECEIVED A BILL FROM A SPECIALIST IN NASHVILLE AND BILL FROM LOCAL PHYSICIAN.  BOTH AROUND $ 600."

(DN 86, Exhibit A at Pages 000003-000004) (all capital letters in the original text).

Based upon a medical damages estimate of $14,000, less the $5,000 medical pay offset, and a $31,500 compensatory damages estimate, Ms. Lasch calculated a total exposure of $40,500 in the case (DN 86, Exhibit A at Page 000004).  She applied the total exposure figure to her assessment of 40% liability to the insured to calculate a reserve of $16,200 (DN 86, Exhibit A at Page 000004).  During her deposition, Ms. Lasch explained the reserve she set was, in her opinion, a worst case scenario based upon the information she had at the time (DN 87, Exhibit C - - Lasch Deposition at Page 68).

In a letter dated March 23, 2004, Mr. Friedman asked Ms. Lasch to provide copies of an accident report if there is one and statements taken from Mr. Meador and any other witnesses to the accident (DN 70, Exhibit A).  Additionally, he requested that she identify the person or company responsible for stacking the soft drinks (DN 70, Exhibit A).

In a Claims Diary entry, dated March 29, 2004, Ms. Lasch commented "WITH ALL OF THE CLAIMANT'S PROBLEMS, I BELIEVE THE CLAIMANT WILL ATTEMPT TO ALLEGE THIS FALL CAUSED MUCH OF HIS PROBLEM[sic]" (DN 86, Exhibit A at Page 000004) (all capital letters in original text).  Additionally, she noted that the RC distributor responsible for the display needed to be put on notice of the claim (DN 86, Exhibit A at Page 000004).

In a letter dated April 1, 2004, Ms. Lasch advised Mr. Friedman the only statement she had was from Mr. Meador and that a copy will be provided once it is transcribed (DN 70,

Exhibit A).  She also indicated she did not yet have the specifics on the RC product distributor or the route sales representative who is responsible for the display (DN 70, Exhibit A).

Notably, in a Claims Diary entry dated April 1, 2004, Ms. Lasch indicated although Mr. Friedman requested a copy of the incident report she would not be providing it at this time because it was work-product (DN 86, Exhibit A at Page 000005).  A Claims Diary entry later that same day indicates Ms. Lasch contacted Mr. Pedigo by telephone and recorded his statement (DN 70, Exhibit A; DN 86, Exhibit A at Page 000005).  In his statement, Mr. Pedigo reported seeing Mr. Meador reach up over his head to remove a case of soft drinks from the display (DN 70, Exhibit A -- Statement of Mr. Pedigo).  Mr. Pedigo indicated he then saw Mr. Meador falling backwards and one or two of the cases from the display fell on top of him (DN 70, Exhibit A - - Statement of Mr. Pedigo).

In a letter dated April 20, 2004, Mr. Friedman reminded Ms. Lasch that he had not yet received the transcribed statement of Mr. Meador or verification that Houchens is the owner of the Sav-A-Lot in Scottsville (DN 70, Exhibit A).  Additionally, he again  requested information regarding the RC products distributor (DN 70, Exhibit A).  Mr. Friedman also advised Ms. Lasch that his client would soon be undergoing surgery related to neck and back problems  that the treating physicians would relate to the accident (DN 70, Exhibit A).

A May 12, 2004, entry in the Claims Diary indicates Ms. Lasch received information regarding the RC distributor (DN 86, Exhibit A at Page 000005).  On that same day, Ms. Lasch sent a letter to the RC distributor regarding the incident (DN 86, Exhibit A at Page 000005).  Additionally, on May 12, Ms. Lasch sent to Mr. Friedman a cover letter with copies of the transcribed statements of Messrs. Meador and Pedigo (DN 70, Exhibit A; DN 86, Exhibit A at Page 000005).  Her final entry in the Claims Diary for that day reads, "AM GOING TO HAVE SIU GET

INVOLVED IN THIS CASE IN AN EFFORT TO GET SOME GOOD BACKGROUND INFORMATION ON THIS CLAIMANT" (DN 86, Exhibit A at Page 000005) (all capital letters in original text).  The initials "SIU" stands for Special Investigations Unit (DN 86, Exhibit C).

By letter dated June 1, 2004, Mr. Friedman advised Ms. Lasch as of that date, his law firm no longer represented Mr. Meador in his claim against Houchens (DN 70, Exhibit A).  His letter indicates a copy was sent to Mr. Meador (DN 70, Exhibit A).  A date stamp on the letter indicates Ms. Lasch received it on June 2, 2004 (DN 70, Exhibit A).  Notably, Mr. Friedman had yet to send a formal written demand for payment of damages on behalf of Mr. Meador.  Additionally, he did not provide Ms. Lasch with written authority to make payments to any medical providers.

A Claims Diary entry indicates Ms. Lasch made an SIU referral on the morning of June 4, 2004 (DN 86, Exhibit A at Page 000007).  A subsequent entry that morning indicates  "9:56 AM APPROVED!" (DN 86, Exhibit A at Page 000007) (all capital letters in original text).  Notably, her Claims Diary entry that day sets forth a general summary of information about the accident, Mr. Meador's history of prior injuries, and his history of prior surgeries on the neck and back (DN 86, Exhibit A at Page 000007).  Her entry also includes the comment "POSSIBLE PRIOR CLAIMS ON SUBJECT" (DN 86, Exhibit A at Page 000007) (all capital letters in original text).  Further, her Claims Diary entry indicates the SIU plan of action will be:

> "1.  BACKGROUND CHECK AND COMP REPORTS
>  2.  NICB HISTORY INVESTIGATION
>  3.  REQUEST MASTER TRACE INVESTIGATION
>  4.  MAKE DETERMINATION IF SURVEILLANCE WILL BE SCHEDULED
>   5.  PROVIDE ANY OTHER ASSISTANCE AS REQUESTED BY THE ADJUSTER."

(DN 86, Exhibit A at Page 000007) (all capital letters in original text).

The SIU referral form indicates the basis for referral is "[p]revious medical problems are extensive; circumstances" (DN 86, Exhibit A at Page 000007, Exhibit M at Page 1).  The referral

8

indicates "**Exposure** 75000.00"(DN 86, Exhibit M at Page 1) (emphasis in original).  Additionally,

Ms. Lasch included the following comment regarding Mr. Meador:

> "MISSING SEVERAL FINGERS ON HIS RIGHT HAND; HAS HAD PRIOR
> NECK AND BACK SURGERY - ALL WORK RELATED.  I AM 99% SURE
> COMMERCIAL UNION INS. HAD A LARGE COMP CLAIM ON HIM - OR
> SOMEONE WITH THE EXACT SAME NAME."

(DN 86, Exhibit M at Page 2) (all capital letters in original text).

In a Claims Diary entry on June 10, 2004, Ms. Lasch acknowledged receipt of Mr.

Friedman's withdrawal letter (DN 86, Exhibit A at Page 000006).  Notably, she commented "IT

MAY HAVE BEEN THAT WITNESS STATEMENT I SENT HIM" (DN 86, Exhibit A at Page

000006) (all capital letters in original text).

Mr. Meador and his wife Sondra Meador (collectively the "Meadors") subsequently

retained attorney Matthew Baker to represent them.  On August 18, 2004, Mr. Baker filed a

complaint, on behalf of the Meadors, in the Allen Circuit Court in Scottsville, Kentucky.  Notably,

prior to filing suit, he did not send a letter of representation to Indiana Insurance.  Nor did he serve

a formal written demand for payment on behalf of the Meadors.

The original complaint named Houchens and Royal Crown Bottling Corporation

("Royal Crown") as Defendants and sought damages for negligence and loss of consortium as a

result of the accident on December 15, 2003 (DN 1, State Court Complaint).  The Meadors alleged

that a display of Royal Crown soft drinks fell on Mr. Meador while he was on the premises of

Sav-A-Lot (DN 1, State Court Complaint; DN 8).

On February 15, 2005, the Meadors filed an amended complaint that named

Houchens' insurer, Indiana Insurance, as a defendant (DN 1, State Court Amended Complaint).  The

amended complaint asserts that the Meadors are third-party claimants under Houchens' insurance

policy and that Indiana Insurance breached common law duties of good faith and fair dealing as well

as statutory duties under the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA") and the Kentucky Consumer Protection Act ("CPA") in its handling of Mr. Meador's claim (DN 1, State Court Amended Complaint; DN 8).

On the eve of trial before the Allen Circuit Court[1], the Meadors settled their underlying tort claims against Houchens and Royal Crown (DN 8).  As a result, only their common-law and statutory bad faith claims remained pending against Indiana Insurance (DN 8). On December 15, 2005, Indiana Insurance removed the action to this Court pursuant to 28 U.S.C. § 1441 because the diversity of citizenship requirements in 28 U.S.C. § 1332(a)(1) were satisfied (DN 1, 5, 8, 9).

On March 17, 2006, Indiana Insurance filed a motion for summary judgment (DN 14).  The Meadors filed a response (DN 25) and Indiana Insurance filed a reply (DN 29).  In a report and recommendation, entered July 14, 2006, United States Magistrate Judge E. Robert Goebel recommended that the motion for summary judgment be granted in part and denied in part (DN 51). More specifically, the Magistrate Judge recommended that summary judgment should be granted in favor of Indiana Insurance and against the Meadors as to their common law bad faith claim and their statutory claim under the CPA (DN 51).  The Magistrate Judge recommended denying the motion for summary judgment as to the Meadors' statutory claims under UCSPA, with leave to refile after the parties have conducted discovery (DN 51 at Page 6).  In an order entered August 22, 2006, the Court adopted the recommendations of the  Magistrate Judge (DN 56).

Discovery has now been completed.  Indiana Insurance has filed a renewed motion for summary judgment (DN 70), the Meadors have filed their response (DN 85, 86), and Indiana

---

[1]Indiana Insurance indicates the underlying tort case settled on November 22, 2005 (DN 70, Memorandum at Page 8).  The Meadors assert that the case settled on November 30, 2005 (DN 85 at Page 8).

Insurance has filed its reply (DN 87).

## DISCUSSION

The KUCSPA, set forth at KRS 304.12-230, creates both first-party and third-party obligations to settle insurance claims in good faith. Rawe v. Liberty Mutual Fire Insurance Company, 462 F.3d 521, 532 (6th Cir. 2006). According to the Supreme Court of Kentucky, the KUCSPA "imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured or to another person bringing a claim under an insurance policy." Knotts v. Zurich Insurance Company, 197 S.W.3d 512, 515 (Ky. 2006) (citing KRS 304.12-230). The Supreme Court of Kentucky noted, however, that the KUCSPA did not lay out an "amorphous, nonspecific duty...[i]nstead, it proscribes a list of [fifteen] particular acts and practices." Knotts, 197 S.W.3d at 515.

The Meadors allege Indiana Insurance has violated subsections (3), (4), (6), and (7) of the KUCSA. Those portions of the KUCSA read as follows:

> "It is an unfair claims settlement practice for any person to commit or perform any of the following acts or omissions:
> (3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;
> (4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;...
> (6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
> (7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;..."

KRS 304.12-230(3)-(4), (6)-(7).

In order to prove their third-party bad faith claims under the KUCSPA, the Meadors must demonstrate the following three elements: (1) Indiana Insurance "must be obligated to pay the

11

claim under the terms of the policy;" (2) Indiana Insurance "must lack a reasonable basis in law or fact for denying the claim;" and (3) it must be shown that Indiana Insurance "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed..." Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky. 1993) (quoting Justice Leibson's dissenting opinion in Federal Kemper Insurance Co. v. Hornback, 711 S.W.2d 844, 846-847 (Ky. 1986)). Notably, under this rule "an insurer is ... entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts." Wittmer, 864 S.W.2d at 890 (quoting Justice Leibson's dissenting opinion in Federal Kemper Insurance Co., 711 S.W.2d at 847). The first element is not in dispute. Thus, the Meadors must satisfy their burden as to the second and third elements.

Additionally, the Meadors must demonstrate more than a mere technical violation of the KUCSPA to maintain their bad faith cause of action. Wittmer, 864 S.W.2d at 890. They must present evidence of conduct sufficient to warrant a punitive damages instruction. Id. Specifically, there must be proof of bad faith "sufficient for the jury to conclude that there was 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" Id. (citations omitted). Furthermore, "[a]s required by KRS 446.070, a condition precedent to bringing a statutory bad faith action is that the claimant was damaged by reason of the violation of the statute."[2] Motorists Mutual Insurance Co. v. Glass, 996 S.W.2d 437, 452 (Ky. 1999). Thus, "[a]bsent resultant damage, there can be no cause of action premised upon the violation of a statute, *i.e.,* the [K]UCSPA. Glass, 996 S.W.2d at 454 (citing KRS 446.070).

---

[2]Under Kentucky law, both first-party and third-party statutory bad faith causes of action are predicated upon KRS 446.070, which reads:

> "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation,..."

Motorists Mutual Insurance Company v. Glass, 996 S.W.2d 437, 451-452 (Ky. 1999).

A

Indiana Insurance argues the Meadors cannot maintain a claim under KRS 304.12-230(7) because they are not parties to the insurance contract (DN 70). The Meadors have not really responded to this argument[3] (DN 85).

The wording of KRS 304.12-230(7) is clearly limited to first-party bad faith claims against an insurer.[4] Since the Meadors are third-party claimants, not insureds, they cannot maintain a bad faith claim under KRS 304.12-230(7). Therefore, Indiana Insurance is entitled to summary judgment on the Meadors' bad faith claim under KRS 304.12-230(7).

B

Next, Indiana Insurance argues it is entitled to summary judgment on the Meadors' claim under KRS 304.12-230(3), because the evidence shows it has adopted and implemented reasonable standards for the prompt investigation of claims (DN 70). The Meadors have not responded to this argument (DN 85). The Court construes the Meadors' silence as a concession that Indiana Insurance is entitled to summary judgment on this claim.

---

[3] In their memorandum the Meadors assert that a violation of KRS 304.12-230(7) occurred because the claims adjuster forced them "into litigation to recover the amounts owed them by making no offer at all" (DN 85 at Page 13).

[4] KRS 304.12-230(7) reads as follows:
> "Compelling *insureds* to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such *insureds*..."
(emphasis added).

C

The Court will now address whether Indiana Insurance is entitled to summary judgment on the Meadors' claims under KRS 304.12-230(4) and (6) because they have not satisfied the condition precedent of resultant damage (DN 70).  Citing KRS 446.070 and Glass, 996 S.W.2d at 454, Indiana Insurance argues since the Meadors have not identified any resultant damage they cannot maintain their cause of action under the KUCSPA (DN 70).

The Meadors have responded by submitting an affidavit from their attorney, Matthew Baker (DN 86, Exhibit K).  His affidavit indicates they incurred $7,823.56 in expenses preparing the underlying  tort action for trial (DN 86, Exhibit K).  Additionally, Mr. Baker's affidavit opines that the failure of Indiana Insurance to timely negotiate settlement in the underlying tort action forced Mrs. Meador to quit her job to care for her husband, which resulted in the loss of tens of thousands of dollars in family income and they experienced significant mental anguish as they dealt with bill collectors and a foreclosure proceeding on their home (DN 85, Exhibit K).

Indiana Insurance's objections to the Baker affidavit lack merit.  The Court will consider Mr. Baker's affidavit along with excerpts from Mrs. Meador's deposition transcript (DN 87, Exhibits A, B) to determine whether the Meadors have demonstrated there is a genuine issue of fact for trial.

Mrs. Meador's deposition testimony indicates her job, the shift she was working, the hours she was working, her husband's injury, and running back and forth to the doctors were the reasons she quit her job (DN 87, Exhibit B - - S. Meador Deposition at Page 52).  Although Mrs. Meador was unable to express in percentages how much each of the above reasons played a roll in her decision to quit work, she did recall having no problem working the shifts and working the overtime before her husband got hurt (DN 87, Exhibit B - - S. Meador Deposition at Pages 52-53).

14

Viewing Mr. Baker's affidavit and Mrs. Meador's deposition testimony in a light most favorable to the Meadors, the Court concludes the Meadors have presented enough evidence to demonstrate a genuine issue of fact regarding resultant damages.  KRS 446.070; Glass, 996 S.W.2d at 452, 454. However, a trial is not appropriate because there are other reasons why Indiana Insurance is entitled to summary judgment on the Meadors' claims under KRS 304.12-230(4) and (6).


D

Indiana argues it is entitled to summary judgment on the Meadors' claim under KRS 304.12-230(4) because it conducted a reasonable investigation based upon all available information and it did not have an opportunity to refuse to pay Mr. Meador's claim before commencement of litigation (DN 70).  The Meadors have responded with a general assertion that Ms. Lasch's "investigation was no investigation at all within the meaning of KRS 304.12-230(4)" (DN 85 at Page 15).

Under KRS 304.12-230(4), "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information..." is an unfair claims settlement practice.  The Supreme Court of Kentucky recently held the duty of good faith and fair dealing imposed on an insurer by KRS 304.12-230 does not end at the commencement of a tort action for which a claim under the insurance policy has been made.  Knotts v. Zurich Insurance Company., 197 S.W.3d 512, 515-518 (Ky. 2006).  In reaching this holding, it concluded the term "'claim,' as used in the statute, means an assertion of a right to remuneration under an insurance policy once liability has reasonably been established." Id. at 516.  The Supreme Court of Kentucky observed, "[t]his is usually done by making the claim directly to the insurance company, which then engages in the claim adjustment process...[b]ut it may also be accomplished by instituting litigation, which is simply another means

of asserting the right under the insurance policy." Id.

Notably, in the context of resolving a dispute on the scope of discovery, the Magistrate Judge acknowledged the recent holding in Knotts but concluded it did not apply herein because the Meadors' "claims under KRS 304.12-230 pertain to conduct that occurred before commencement of the litigation (DN 1, 11, 22, 25, 34)" (DN 48). The Meadors did not move the Court to reconsider the Magistrate Judge's order. Furthermore, in responding to the renewed motion for summary judgment, the Meadors' argument and evidence focuses on the prelitigation conduct of Indiana Insurance[5] (DN 85, 86). Therefore, the Court concludes the Meadors' claims under KRS 304.12-230 are limited to pre-filing conduct by Indiana Insurance.

The Court concludes that Indiana Insurance has sustained its initial burden of informing the Court of the basis of its motion and demonstrating the absence of any genuine issue of material fact. Reviewing the evidence in a light most favorable to the Meadors, the Court concludes they have not demonstrated there is a genuine issue of fact for trial regarding an alleged violation of KRS 304.12-230(4).

The evidence indicates that Messrs. Friedman and Baker did not serve, on behalf of Mr. Meador, a formal demand for remuneration under the insurance policy prior to filing suit in the Allen Circuit Court. Thus, technically, Indiana Insurance did not have an opportunity to refuse a claim for payment under the policy before the tort action was filed. However, the commencement

---

[5]The Meadors' response does provide general information about the eventual settlement of the tort action and their perception that there was an inordinate delay in settling their claims (DN 85). However, their response does not include evidence regarding Indiana Insurance's post-filing settlement behavior such as settlement offers (DN 85, 86). See Knott v. Zurich Insurance Company, 197 S.W.3d 512, 518-523 (Ky. 2006) (addressing the question of what sorts of post-filing conduct by the insurer may be admissible in a bad faith action). Nor does their response include argument explaining why evidence of such post-filing settlement behavior precludes the granting of summary judgment (DN 85, 86).

of litigation by the filing of a complaint also can serve as a claim under the insurance policy. Knotts, 197 S.W.3d at 516-517.

The Meadors general assertion--Ms. Lasch's "investigation was no investigation at all within the meaning of KRS 304.12-230(4)" (DN 85, Memorandum at Page 15)--is not sufficient to create a genuine issue of fact for trial in light of the evidence regarding Ms. Lasch's investigation. Ms. Lasch's entries in the Claims Diary and her comments on the SIU referral form clearly indicate she believed a referral to the SIU was necessary to more fully investigate the issue of causation given Mr. Meador's extensive history of prior related injuries and surgeries.

Notably, in conjunction with their general assertion, the Meadors' argue Ms. Lasch's referral to the SIU did not fully comply with company policy and procedure. Apparently, they believe this alleged procedural omission raises a genuine issue of fact regarding the reasonableness of the investigation. The Court disagrees. There is no indication Ms. Lasch provided false or misleading information on her referral request. Further, a supervisor approved her request based upon the information she provided. Thus, evidence relevant to the question of whether Ms. Lasch fully complied with company policy and procedures for making referrals to the SIU does not create a genuine issue of fact on the question of whether Ms. Lasch conducted "a reasonable investigation based upon all available information..." KRS 304.12-230(4).

In sum, the Meadors have not demonstrated there is a genuine issue of fact for trial regarding their ability to maintain a claim under KRS 304.12-230(4). Further, the record taken as a whole could not lead a rational trier of fact to find for the Meadors on their claim under KRS 304.12-230(4).

E

17

Relying on the statement of a disinterested third-party eyewitness, Mr. Pedigo, Indiana Insurance contends it is entitled to summary judgment on the Meadors' claim under KRS 304.12-230(6) because liability had not become reasonably clear (DN 70, Memorandum at Pages 14-15 and Exhibit B). The Meadors argue liability was "reasonably clear" as early as March 9, 2004, when Ms. Lasch assessed 40% liability to the insured in setting a reserve (DN 85). They contend Ms. Lasch did not attempt in good faith to effectuate a prompt, fair and equitable settlement of their claims after liability became reasonably clear (DN 85).

Under KRS 304.12-230(6), "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear" is an unfair claims settlement practice. Viewing the evidence in a light most favorable to the Meadors, as early as January 12, 2004, Ms. Lasch knew Mr. Pedigo's version of what happened starkly contrasted with Mr. Meador's version. Further, Mr. Pedigo was a disinterested third-party eyewitness whose description indicated Mr. Meador may have caused the accident. If a jury found Mr. Pedigo more credible than Mr. Meador in making their liability determination, they could assign as much as 100% fault to Mr. Meador. Additionally, in apportioning fault a jury could consider the Royal Crown's role in maintaining and stocking the display as well as Mr. Meador's obvious gripping and lifting limitations due to three and one half fingers missing from his right hand. Clearly, liability had not become reasonably clear in this case.

Ms. Lasch was required by Kentucky statutory and regulatory law to set a reserve. KRS 304.6-100; 806 KAR 6:090. Her entry in the Claims Diary indicates assignment of 40% fault to the insured, 40% fault to the cola distributor, and 20% fault to Mr. Meador was solely for the

purpose of setting a reserve.[6]  This is corroborated by Ms. Lasch's unrebutted deposition testimony indicating the reserve was a worst case scenario based on the information she had at the time.[7]  Clearly, this evidence does not create a genuine issue of fact regarding whether liability had become reasonably clear.

The Meadors also argue Ms. Lasch's decision to increase the reserve from $16,200 to $75,000 is evidence that liability had become reasonably clear.  The evidence indicates this dramatic increase in the reserve was the product of Ms. Lasch receiving more information about Mr. Meador's damages, not a reassessment of liability.  Further, Ms. Lasch's entries in the Claims Diary clearly indicate her referral to the SIU was motivated by a desire to more fully investigate the question of causation given Mr. Meador's extensive history of related injuries and surgeries.  Thus, this evidence is not relevant to the question of whether liability had become reasonably clear.

In sum, the Meadors have not satisfied their burden of demonstrating the existence of a genuine issue of fact for trial regarding their claim under KRS 304.12-230(6).  Furthermore, Indiana Insurance has sustained its burden of demonstrating it is entitled to summary judgment on this statutory bad faith claim under the KUCSPA.

## F

The Court will now address Indiana Insurance's argument that the Meadors have not raised any arguments that would suggest its actions were so unreasonable as to be considered outrageous

---

[6]Ms. Lasch's entry in the Claims Dairy reads "MY ASSESSMENT FOR THE PURPOSE OF RESERVE IS 40/40/20" (DN 86, Exhibit A at Page 000003) (all capital letters in the original text).

[7]Contrary to the Meadors' assertion, Ms. Lasch was aware of Mr. Pedigo's version of the accident when she made her assessment of fault for the purpose of setting a reserve.

(DN 70, Memorandum at Pages 15-16).  In essence, Indiana Insurance argues since the evidence is not sufficient to warrant a punitive damages instruction it is entitled to summary judgment on the Meadors' claims under KUCSPA (DN 70, Memorandum at Pages 15-17).  The Meadors argue Ms. Lasch's conduct was sufficiently outrageous to warrant a punitive damage instruction because privately she assessed 40% liability to the insured and by June 4 increased the reserves from $16,200 to $75,000 yet publicly she took a posture of no liability as well as used the SIU to minimize Indiana Insurance's exposure, and she did not attempt to settle the claim until November, 2005 (DN 85).

Viewing the evidence in a light most favorable to the Meadors, they have not demonstrated the evidence is sufficient for a jury to conclude Ms. Lasch's conduct was outrageous because of evil motive or reckless indifference.  Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky. 1993) (citations omitted).  Assessing 40% liability to the insured for the purpose of setting a conservative reserve, increasing the reserve to $75,000 after receiving additional damages information, and referring the case to the SIU to obtain more causation information does not amount to outrageous conduct given the circumstances of this case.  In sum, the evidence is not sufficient to warrant a punitive damages instruction.

<u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Indiana Insurance is entitled to summary judgment as to the statutory bad faith claims the Meadors have asserted under KRS 304.12-230(3), (4), (6) and (7).  Therefore, the Court will issue a separate order granting Indiana Insurance's renewed motion for summary judgement.

Copies:        Counsel